**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| TIMOTHY VALENZIA | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-12-243 |
| | : | |
| | : | |
| BALTIMORE CITY BOARD | : | |
| OF SCHOOL COMMISSIONERS | : | |

**MEMORANDUM**

Plaintiff Timothy Valenzia filed this action alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA") and race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") by his former employer, the Baltimore City Board of School Commissioners ("the Board"). Specifically, Valenzia asserts that one of the Board's African American managers terminated Valenzia because he is white and in spite of his requests for reasonable accommodation of his disability, attention deficit hyperactivity disorder ("ADHD"). The Board has filed a motion for summary judgment. For the reasons stated below, the Board's motion will be granted.[1]

**BACKGROUND**

This action arises out of Timothy Valenzia's employment by and subsequent termination from the Baltimore City Public Schools ("BCPS"), which is managed and operated by the

---

[1] Also pending are three motions filed by Valenzia: two for extensions of time to respond to the Board's motion for summary judgment, (Mot. for Extension of Time, ECF No. 36; Mot. for Extension of Time, ECF No. 37), and one to amend his complaint, (Mot. For Leave to File Amended Compl., ECF No. 35).
  Both of Valenzia's motions for extension of time will be granted. Although the court recognizes the Board's frustration with Valenzia's series of motions, Valenzia seeks only a four-day extension and does so because of extenuating circumstances. Moreover, four days is the same length of time by which the Board sought to extend its time to file its reply—and to which Valenzia consented. (*See* Consent Mot. to Postpone Deadline, ECF No. 41.)
  Valenzia's motion to amend his complaint to add claims under the Rehabilitation Act and Maryland law will be denied because amendment would be futile. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) ("The standards used to determine whether an employer has discriminated under the Rehabilitation Act are the standards applied under the [ADA] . . . ."); *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481 (2007) (noting that Maryland courts "traditionally seek guidance from federal cases in interpreting" Article 49B, although federal cases are not binding).

defendant Board. Valenzia, a white male, worked in facilities management for BCPS from September 25, 2001, until he was terminated effective April 30, 2010.

During his first four years, Valenzia performed his job satisfactorily and without any disciplinary incidents. At the time, Valenzia worked under the supervision of Tony Corbett, with whom Valenzia had a "good to excellent" working relationship. (Def.'s Mot. Summ. J. Ex. 2, Valenzia Dep. 50, ECF No. 26-4.) Early in that relationship, Valenzia disclosed to Corbett that he was a diabetic. (*Id.* at 53.) Corbett accommodated Valenzia's diabetes-related needs by allowing him to eat food while at work and monitor his blood sugar throughout the workday. (*Id.* at 54-55.) During this period, however, Valenzia began to suffer from periodic blood sugar seizures, some of which occurred on the job and required hospitalization, as a result of his diabetic condition. (*Id.* at 58.) Valenzia also began experiencing a "deteriorating memory or ability to organize and communicate [his] thoughts." (*Id.*) Despite these medical difficulties, Corbett noted no problems with Valenzia's performance. (*Id.* at 50.) Valenzia acknowledges that he was never subject to adverse treatment as a result of his diabetic condition. (*Id.* at 54-57.)

On October 24, 2004, Valenzia was promoted to Project Supervisor, the position from which he would eventually be terminated. In that role, Valenzia was newly responsible for supervising and monitoring various renovation, construction, and contract maintenance projects for BCPS. (Valenzia Dep. 47; Def.'s Mot. Summ. J. Ex. 1, Jones Decl. ¶ 9, Ex. B, ECF No. 26-3.) Valenzia also was required to input status updates into a computer system known as ACT so that the Manager of Contract Maintenance could keep track of pending projects. (Def.'s Mot. Summ. J. Ex. 3, Teller Decl. ¶ 4, ECF No. 26-5.) At some point in 2005, Corbett left his job with BCPS and Valenzia began reporting to Vernon Smith, a white manager in the Repair Shop division. Under Smith's supervision, on August 7, 2006, Valenzia experienced his first

2

disciplinary action, a suspension for sending a string of inappropriate emails relating to a change in department procedure. (Valenzia Dep. 66-67.)

In 2007, Valenzia began reporting to Louis Teller, another white manager. (Teller Decl. ¶ 3.) From this point, Valenzia's performance began to decline. According to Teller, Valenzia "fail[ed] to properly review and monitor the outside contractors' work." (*Id.* at ¶ 6.) He also failed to make timely updates into the ACT system. (*Id.* at Ex. A.) As a result of Valenzia's deficient performance, Teller placed Valenzia on a Performance Improvement Plan ("PIP") in February 2009. (*Id.* at ¶ 6.) As part of this PIP, Teller temporarily relieved Valenzia of responsibility for supervising outside contractors and instead assigned him to work on an in-house project. (*Id.*) To give Valenzia a chance to improve and avoid losing his job, Teller took on the supervisory work of which Valenzia had previously been in charge. (*Id.*) But subsequent PIP reviews showed that Valenzia's performance had not improved. (*Id.* at Exs. B, C.)

Valenzia's account of this period differs significantly. According to Valenzia, the entire impetus for Valenzia's being placed on a PIP came from Deputy Chief Operating Officer Kevin Seawright, an African American male. Valenzia alleges that Seawright "had objections to [his] performance[,] . . . wanted to have [his] job terminated," and directed Teller to put Valenzia on a PIP "as a preliminary step in securing [his] termination." (Pl.'s Opp'n Summ. J. Ex. 1, Valenzia Decl. ¶ 8, ECF No. 39-1.) Teller, acting under Seawright's orders, restricted Valenzia to working on the single in-house project even though Valenzia knew he was responsible for other projects, putting Valenzia in a "hopelessly difficult position." (Valenzia Decl. ¶ 14.) During subsequent reviews, Teller revealed that even though Teller was willing to take Valenzia off of the PIP, he was continuing the PIP at Seawright's insistence. (Valenzia Dep. 82-83.) The PIP was simply a means of documenting Valenzia's missteps to justify his eventual termination.

3

In August 2009, with the opening day of school around the corner, the facilities department experienced an increased workload. (Teller Decl. ¶ 7.) Already stretched thin, Teller spoke with Seawright about how to handle the increase. (*Id.* at ¶ 8.) Upon learning that Valenzia was not presently supervising contractors, Seawright told Teller that Valenzia needed to be held to the same performance standards as the other Project Supervisors[2] and that he should therefore be restored to supervising the work of contractors, "one of the essential functions of his job." (*Id.*) Accordingly, Teller started a new PIP in September 2009, restoring Valenzia's contract supervision duties. (*Id.* at ¶ 9.)

But Valenzia's subpar performance continued. For example, as part of his new PIP, Valenzia was required to keep a written record of contractor hours worked on a major electrical project; yet he failed to produce any documentation upon Teller's request and the project ended up costing $4,000 over budget. (Valenzia Dep. 128-30.) On September 2, 2009, Teller gave Valenzia an official written reprimand for "willful neglect of duties" after he failed to follow up on an important project involving the installation of fire alarm covers in a school.[3] (Teller Decl. Ex. H.) Later PIP reviews revealed that "[u]pdates for assigned projects have not been given in a timely or accurate manner," "[p]roject supervision and maintenance of multiple projects/tasks has been unacceptable," and "improvement has not been made." (*Id.* at Exs. E, F.)

As a result of these deficiencies, Teller could no longer assign Valenzia the same amount of work as his peer managers or offer Valenzia any more help without overloading himself or the rest of the department. (*Id.* at ¶ 13.) Accordingly, on December 2, 2009, Teller sent an email to Manager of Labor Relations Jerome Jones recommending Valenzia's termination. (*Id.* at ¶ 14, Ex. J.) Teller's recommendation was based purely on his "own personal observations, and not

---

[2] Valenzia acknowledges that Seawright put similar pressure on the rest of the department to increase their workloads. (Valenzia Dep. 81-82.)
[3] According to Valenzia, the delay was attributable to the contractor's irresponsibility, not his. (Valenzia Dep. 112.)

on the opinion or suggestion of anyone else." (*Id.* at ¶ 14.) According to Teller, "[n]one of the other Project Supervisors under [his] supervision had anywhere near as many performance problems as did Mr. Valenzia." (*Id.*)

The following months in 2010 saw a continuation of mishaps—mishaps that eventually led to Valenzia's termination. On February 2, 2010, Teller assigned Valenzia to hire a contractor to repair a broken light fixture hanging from the ceiling of a school's gymnasium; despite the urgency of the situation, Valenzia did not complete the assignment until March 22, 2010. (Teller Decl. ¶ 12.) Also in March, Teller learned that Valenzia had failed to follow up on a heater installation project that had been assigned to Valenzia on December 4, 2009. (Valenzia Dep. 138-42; Teller Decl. ¶ 15.) Valenzia could not produce any documentation regarding his management of that project, even though Teller had specifically directed him to retain such records. (Teller Decl. ¶ 16, Ex. K.) At Seawright's direction, Teller suspended Valenzia. (*Id.*)

Valenzia's account of this tumultuous period also differs. He claims that while he was on a PIP, he had repeatedly informed his supervisors about his ongoing memory, organizational, and communication problems—the same problems he had originally disclosed while under Corbett's supervision.[4] (Valenzia Decl. ¶ 12.) Instead of accommodating Valenzia's medical limitations, Teller and Seawright ignored his pleas for help and pressed on with the plan to gather evidence that would justify his eventual termination. (*Id.* at ¶ 13.)

On March 25, 2010, Teller sent Jones another email seeking Valenzia's termination. (Teller Decl. ¶ 17, Ex. J.) Jones scheduled a pretermination hearing for Valenzia, which was held on April 14, 2010. (Jones Decl. ¶ 11.) At this hearing, Valenzia "said nothing" about any

---

[4] When questioned as to whether he asked for "any type of accommodation because of the ADHD" or for "[a]ny type of work-related accommodation," Valenzia said he asked Teller "if there was anything they can help me with, any way he can help me through these – through this with my memory problems and everything else." (Valenzia Dep. 181.) Additionally, although Valenzia notes he asked his supervisor for "help with things many times," he acknowledges he did not ask for anything specific. (*Id.* at 182.)

5

ADHD diagnosis or memory problems; nor did Valenzia request any disability-related accommodations. (Teller Decl. ¶ 18; Jones Decl. ¶ 12.) As the presiding hearing officer, Jones determined that Valenzia should be terminated due to his "repeated and sustained performance problems." (Jones Decl. ¶ 12.) Accordingly, through a letter dated April 26, 2010, BCPS terminated Valenzia's employment effective April 30, 2010. (*Id.* at Ex. C.)

Valenzia appealed his termination internally under section 4-205 of the Maryland Code, Education Article. Md. Code, Educ. § 4-205. Before the administrative hearing, but after the pretermination hearing, Valenzia sought, for the first time, professional medical evaluations separately with Dr. Joshua Rosenthal and Dr. Kenneth Ellis. (Valenzia Dep. 170-71, 203-05, Exs. 20, 25.) Dr. Ellis did not, however, diagnose Valenzia with ADHD until May 11, 2010, and Dr. Rosenthal did not state his opinion that Valenzia could perform the essential functions of his job until March 7, 2011. (*Id.*) At the appeals hearing, held on November 9, 2011, Valenzia for the first time presented evidence of his ADHD diagnosis. (Valenzia Decl., at Attach. 1.) Noting Valenzia's ADHD, the hearing officer recommended Valenzia be reinstated in his position. (*Id.*) The Board, however, rejected the hearing officer's recommendation. (Def.'s Mot. Summ. J. Ex. 5.) Valenzia then appealed to the Maryland State Board of Education, which affirmed the Board's decision on February 26, 2013. (*Id.*)

Meanwhile, on August 1, 2010, Valenzia filed a Charge of Discrimination with the EEOC alleging race, age, and disability discrimination.[5] (Valenzia Dep. 234-35, Ex. 27.) Valenzia claimed Seawright specifically targeted him and Christine Bradshaw, another white Project Supervisor, for termination. (*Id.* at 198-200.) The EEOC issued a finding of no probable

---

[5] In his Charge, Valenzia did not allege discrimination regarding his termination. Instead, he alleged he had "been kept on a PIP despite successfully completing it" and that his "employer held a pre-termination meeting regarding [him]." (Valenzia Dep. Ex. 27.)

cause on October 21, 2011.  (*Id.* at Ex. 28.)  After receiving a right-to-sue letter, Valenzia filed the instant action.[6]

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.*  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted).  At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).  Because Valenzia has failed to set forth specific facts showing a genuine issue for trial, the Board's motion for summary judgment will be granted.

---

[6] The court acknowledges but does not need to address the administrative exhaustion, timeliness, and sovereign immunity issues the Board has raised.

I. **ADA Failure to Accommodate Claim**

The thrust of the Board's argument is that Valenzia's ADA claim fails because the Board had no notice of Valenzia's ADHD until *after* he had been terminated. Valenzia argues his claim survives because the Board knew of Valenzia's ADHD through both his disclosure of his memory, concentration, and organizational problems to his supervisors and the hearing officer's recognition of Valenzia's ADHD diagnosis. The Board prevails.

The ADA makes it illegal for an employer to "discriminate against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). One form of discrimination, which is what Valenzia alleges here, is the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." *Id.* § 12112(b)(5)(A). To establish a prima facie case for failure to accommodate, a plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (alteration in original) (quoting *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). Although the Board does not concede that Valenzia's ADHD was a disability falling within the statute, (*see* Def.'s Mot. Summ. J. 28, ECF No. 26 ("Assuming *arguendo* that Plaintiff's ADHD qualifies as a disability under the ADA . . . .")), the parties' primary dispute concerns whether the Board had notice of ADHD, the disability Valenzia alleges the Board failed to accommodate, (*see* Compl. ¶ 29 ("Defendant Board acted unlawfully . . . by denying him fair accommodation of his medical disability, ADHD . . . .")). Because Valenzia cannot show that the Board had such notice, the Board is entitled to summary judgment.

An employer is not expected to accommodate disabilities of which it is unaware. *See* 29 C.F.R. app. § 1630.9 ("[A]n employer would not be expected to accommodate disabilities of which it is unaware."); *Wilson*, 717 F.3d at 346-47 (discussing employee's duty to put employer on notice of disability); *Adamczyk v. Chief, Baltimore Cnty. Police Dep't*, 952 F. Supp. 259, 264 (D. Md. 1997) ("[A]n employee cannot succeed on a claim of [ADA] discrimination . . . when the employer was not even aware of the employee's disability."). Though the burden is "not a great one," and does not require the use of magic phrases, an employee must inform the employer of both the existence of the disability and the "need for the accommodations for that disability." *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008)). "[V]ague or conclusory statements revealing an unspecified incapacity are not sufficient" to satisfy this burden. *Rock*, 819 F. Supp. 2d at 473 (quoting *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *6 (4th Cir. Oct. 23, 1996) (unpublished)). An employer is not required to divine from an observation of a symptom of a disability that an employee actually has a disability.

Here, the record unequivocally reflects that the Board was unaware of Valenzia's ADHD until *after* his termination.[7] Valenzia's pretermination hearing occurred on April 14, 2010. Valenzia first interaction with Dr. Rosenthal—the doctor who diagnosed Valenzia with ADHD—occurred one week later, on April 21, 2010. Valenzia did not notify the Board of this diagnosis until much later. This chronological discrepancy in itself would likely be fatal to Valenzia's claim. *See Rock*, 819 F. Supp. 2d at 474 (granting summary judgment on failure to accommodate claim because record established that defendant "did not learn that Plaintiff suffered from alcoholism until after he had been terminated"); *see also Fuoco v. Lehigh Univ.*,

---

[7] Because Valenzia cannot show the Board was on notice of his ADHD, the court need not address the issue of whether he requested accommodations for his ADHD.

981 F. Supp. 2d 352, 366 (E.D. Pa. 2013) ("[Plaintiff] acknowledges that the ADD diagnosis did not come to her until after she was terminated and therefore no one could have known about this alleged disability, yet [sic] alone considered it as part of the decision to fire her."); *Scott v. Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 595 (S.D.N.Y. 2002) ("Plaintiff's claim for an accommodation fails because she had already been terminated before she requested the accommodation . . . .").

The record, moreover, shows that Valenzia himself never attributed his problems to ADHD during his employment. On Dr. Rosenthal's intake questionnaire, in response to the question of why he was seeking evaluation, Valenzia wrote, "I think that my *Diabetic* conditions has affected my ability to communicate properly, think clearly, organize my thoughts and comprehend Instructions." (Valenzia Dep. Ex. 25 (emphasis added).) Valenzia also surmised, "ADD? ADHD?" (*Id.*) If even Valenzia did not know he had ADHD at that point, one wonders how Valenzia plausibly alleges the Board did or should have had this knowledge in the weeks and months before his termination. Accordingly, Valenzia did not give adequate notice of his ADHD before his termination.

Valenzia's arguments that he did give adequate notice are unconvincing. First, Valenzia argues his disclosures regarding ADHD made after his termination were effective. (*See, e.g.*, Pl.'s Opp'n Summ. J. 3, ECF No. 39 ("[T]he record is also just as plain that Hearing Officer Daniels acknowledged the Plaintiff's diagnosis with ADHD."); *id.* at 13 ("[T]hrough the prosecution of his administrative appeal, Plaintiff communicated a request for reasonable accommodation.").) But such disclosures were too late, as Valenzia had already been terminated. Second, Valenzia claims that notifying Teller about problems with memory and organization before his termination was sufficient. But Valenzia's statements regarding his

10

general problems were of the vague and conclusory kind that carry no legal weight. Even assuming those statements were sufficiently specific, any request for accommodation would have been made only on account of his *diabetes*. And the Board certainly was not required—nor, for that matter, able—to infer that a request made due to his diabetes somehow effectuated a request for accommodation of his yet-to-be-known ADHD. In short, Valenzia has failed to "communicate[] to [the Board] his disability and his desire for an accommodation for that disability." *Wilson*, 717 F.3d at 346-47. Accordingly, Valenzia's failure to accommodate claim fails as a matter of law.

## II. Title VII Race Discrimination Claim

The Board argues Valenzia's Title VII claim fails because it relies entirely on speculation. Valenzia argues he has at least raised a genuine issue that Seawright harbored discriminatory animus against Valenzia and Robert Shank, another white employee. Again, the Board prevails.

Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). A plaintiff bringing a claim under Title VII "may avert summary judgment . . . through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff can present "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Second, a plaintiff may "proceed under [the *McDonnell Douglas*] pretext framework, under which the

11

employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* at 318 (alteration in original) (quoting *Hill*, 354 F.3d at 285) (internal quotation marks omitted). To establish a prima facie claim of discrimination a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Because Valenzia can satisfy neither avenue of proof, the Board's motion will be granted on this count.

      Valenzia fails to satisfy the first avenue of proof. Valenzia relies on two pieces of evidence, neither of which raises a genuine issue that race motivated his termination. Valenzia first relies on an alleged comment made by Seawright to Teller that he wanted either Valenzia or Bradshaw, another white Project Supervisor, fired.[8] (Valenzia Dep. 199-200.) This comment is insufficient because it is entirely speculative. Valenzia admits that he met Seawright only "once or twice"; during the times he did meet with Seawright, he never said anything critical about Valenzia's job performance or race; and Teller never explained why Seawright wanted to terminate Valenzia. (*Id.* at 81-82, 199.) Although he lacked personal knowledge of the actual circumstances behind this secondhand statement, Valenzia somehow "felt" and "believed" Seawright was trying to terminate him on account of his race. (*Id.* at 82-83.) This is not enough to prove Seawright harbored discriminatory animus toward Valenzia that actually resulted in his termination. Next, Valenzia relies on the declaration of Robert Shank, another former BCPS employee, who attests to the "climate" of "racial hostility" created by Seawright in another BCPS facility. (Pl.'s Opp'n Summ. J. Ex. 4, Shank Decl. ¶ 3, 5, ECF No. 39-6 ("Shank Decl.").)

---

[8] Notably, Valenzia is the only person to testify to Seawright's alleged comment to Teller. Teller does not acknowledge this comment in his declaration.

In August of 2007, Shank apparently overheard Seawright, in conversation with another BCPS employee, refer to Shank as a "White boy." (*Id.* at ¶ 5.) Again, this stray comment, made to a third-party three years before Valenzia's termination and referring to an employee with whom Valenzia "did not work directly" (*id.* at ¶ 2), does not create a genuine issue of material fact.

Valenzia also fails to satisfy the *McDonnell Douglas* burden-shifting test. Valenzia cannot establish a prima facie case because he fails to show either satisfactory job performance or differential treatment from similarly situated employees outside his protected class.[9]

The record clearly shows that Valenzia was not meeting the Board's legitimate expectations when he was terminated. Before Valenzia was placed on a PIP, his performance had declined dramatically. After he was placed on a PIP, Valenzia continued to fail in his responsibilities: he failed to supervise properly the work of contractors, failed to make timely or accurate updates into the ACT computer system, and failed to communicate effectively with coworkers and supervisors. This subpar performance persisted despite the specific instructions for improvement Teller outlined in his PIP reviews. Valenzia even admits as much. (*See* Pl.'s Opp'n Summ. J. 8 ("By every account of events, Plaintiff's performance under the PIP was problematic.").) Valenzia's extensive disciplinary history and lack of improvement demonstrates he was not meeting the Board's legitimate expectations. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517-18 (4th Cir. 2006) (affirming that plaintiff did not meet performance prong of prima facie Title VII claim because he received reprimands "based on concrete, specific observations and [his employer] accompanied its reprimands with explicit instructions on how to improve"); *Hart v. Broadway Services, Inc.*, 899 F. Supp. 2d 433, 442 (D. Md. 2012) (finding

---

[9] Even assuming he *had* established a prima facie case, Valenzia could not meet the remaining steps of the *McDonnell Douglas* framework. The Board had a legitimate, nondiscriminatory reason for terminating Valenzia based on his well-documented subpar performance. Moreover, Valenzia sets forth no evidence that the Board's basis for terminating him was "actually a pretext for discrimination." *Hill*, 354 F.3d at 285 (citations omitted).

plaintiff failed to show he was meeting employer's "legitimate expectations," even though he had "three positive performance evaluations" in his file because, "[i]n the final two years before [he] was terminated, his performance was decidedly poor").

Valenzia also fails to produce evidence of any treatment different from a similarly situated person outside his protected class. As an initial matter, Valenzia identifies no nonwhite comparator who was treated more favorably. Valenzia instead speculates, "*I don't think everybody was really up-to-date*" with their assignments. (Valenzia Dep. 90 (emphasis added).) This inability to identify a comparator is unsurprising, given that "[n]one of the other Project Supervisors under [Teller's] supervision had anywhere near as many performance problems as did Mr. Valenzia." (Teller Decl. ¶ 14.) Even if Valenzia had identified a relevant comparator, the Board presents evidence suggesting the absence of discriminatory treatment: at the time of Valenzia's termination, Teller supervised five other Project Supervisors (including Bradshaw), four of whom were white and one of whom was African American; in 2013, Teller hired an additional white Project Supervisor; and all of these Project Supervisors remain employed by the Board today. (*Id.* at ¶ 19.) If anything, Valenzia's own testimony suggests everyone in his department—whether white or African American—was treated equally. (*See* Valenzia Dep. 81 (admitting "Kevin Seawright created more pressure on the entire department" during the start of the 2009 school year); *id.* at 90 ("[T]hey were putting pressure on everybody to get up-to-date . . . .").) Any differential treatment turned on his performance, not his race. Valenzia cannot establish a prima facie case. Accordingly, Valenzia's claim for race discrimination fails as a matter of law.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment will be granted.

A separate Order follows.

September 17, 2014                                      /S/
Date                                                 Catherine C. Blake
                                                     United States District Judge